UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**      CRIMINAL NO. 09-20025

                                   HONORABLE AVERN COHN

vs.

                                   VIOLATION:
                                   18 U.S.C. § 1951 (extortion)
**D-4    SAMUEL L. RIDDLE, JR.**    18 U.S.C. §§ 1341, 1346 (mail fraud)
                                   18 U.S.C. § 666 (bribery)
        Defendant.                 18 U.S.C. § 1001 (false statement)
_____/     18 U.S.C. § 2 (aiding & abetting)


## THIRD SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this indictment:

1.  The Detroit City Council ("City Council" or "Council") was a full-time

legislative body of the City of Detroit, a governmental unit, a municipal corporation, and

a political subdivision of the State of Michigan.

2.  Monica Conyers was elected to the Detroit City Council in the general election

in 2005, and began to serve a four year term on January 1, 2006, as President *Pro*

*Tempore*. In January 2007, Conyers, by virtue of her position as a member of City

Council and following her selection by her fellow members of Council pursuant to

Section 47-1-4 of the Detroit Code, became an *ex officio* trustee of the General Retire-

ment System for a term of two years, beginning in January 2007. Conyers served as the

*ex officio* board member from City Council for all subsequent times pertinent to this indictment.

3.   On January 3, 2006, defendant SAMUEL L. RIDDLE, JR. signed a personal services contract with the City of Detroit to serve as a legislative assistant to City Council Member Conyers between January 1, 2006 and June 30, 2006.  In or about June 2006, RIDDLE signed a one-year personal services contract to be Conyers' legislative assistant from July 1, 2006 to June 30, 2007.  On May 24, 2007, RIDDLE signed a second one-year personal services contract for the same position, covering July 1, 2007 to June 30, 2008.  During the time periods covered by the above contracts, RIDDLE's title and responsibilities included Chief of Staff to City Council President *Pro Tempore* Conyers.  Each of the three above-described contracts contained a conflict of interest provision in which RIDDLE promised he had no personal or financial interest that would conflict in any manner or degree with his services as a legislative assistant to Conyers. RIDDLE further promised in this provision that he would not acquire such personal or financial interests in the future while serving Conyers.

4.   Conyers, in discharging her duties as a City Council member and City Council's *ex officio* representative to the General Retirement System Board of Trustees, and RIDDLE, in discharging his duties as an aide to Conyers, were bound by certain laws, ordinances, ethical requirements and duties, including, but not limited to, the following:

a.     <u>Duty of Honest Services</u>.  Conyers and RIDDLE owed a duty to provide

honest services to the citizens of the City and the participants and beneficia-

ries of the General Retirement System, and to act in their best interests by,

among other things, refraining from using their positions for private gain

and by disclosing conflicts of interest.

b.     Using City Office for Private Gain.  Conyers was prohibited from using her

public office for private gain by, among other things, accepting or receiving

any benefit as remuneration for improperly influencing an official action or

as inducement to act in favor of some interest other than the public interest.

*See* Ethics Ordinance of the Detroit City Charter, Article VI, Sections 2-6-1

and 2-106, and Article VI, Sections 2-6-61 and 2-6-68.  Conyers and

RIDDLE also were prohibited from acting as compensated agents or

representatives for another person, business or organization in any matter

pending before any City agency.  *See* Ethics Ordinance, Article VI, Section

2-6-66.

c.     Acting on Certain City Contracts.  Conyers was prohibited from voting on,

or exercising significant authority over, any matter related to the approval

of a contract in which she had a pecuniary interest, including soliciting or

accepting a monetary payment from a contractor or a contractor's agents or

immediate family.  *See* Detroit City Charter and Ethics Ordinance, Chapter

1, Section 4-108, and Ethics Ordinance, Article VI, Section 2-6-69.  Before

- 3 -

Conyers could make a decision on a contract in which she had a pecuniary interest, she was required to disclose promptly such interest in the minutes of the City Council and file it with the City Clerk.  *See* Detroit City Charter, Chapter 1, Section 4-108 and Ethics Ordinance, Article VI, Section 2-6-32.

    d.    <u>Duties of Pension Fund Trustees</u>.  As City Council's *ex officio* representative to the General Retirement System Board of Trustees, Conyers was prohibited by state law from dealing with the assets of the General Retirement System in her own interest or receiving any consideration for her own personal account from any party dealing with General Retirement System assets.  *See* Public Employee Retirement System Investment Act, M.C.L. § 38.1133(7).  Conyers was also required by state law to discharge her duties solely in the interest of General Retirement System participants and beneficiaries, including making investments for the exclusive purposes of providing benefits to General Retirement System participants and beneficiaries.  *See* M.C.L. § 38.1133(3).

5.  RIDDLE owned and operated Meridian Management Systems, which was purportedly a consulting business.

## COUNT ONE
### (Conspiracy to Commit Extortion, 18 U.S.C. § 1951)

**D-4    SAMUEL L. RIDDLE, JR.**

1. The allegations contained in paragraphs One through Five of the General Allegations are incorporated by reference as if fully set forth herein.

2. Beginning in approximately March 2006, and continuing through approximately December 2007, in the Eastern District of Michigan, Southern Division, defendant SAMUEL L. RIDDLE, JR. did knowingly and intentionally conspire with Monica Conyers and others to knowingly, willfully and unlawfully commit extortion, which affected interstate commerce, in that they agreed to attempt to obtain, and did obtain, cash payments, consulting contracts, and other property from persons who dealt with, or sought to deal with the Detroit City Council and the General Retirement System, with the consent of the payors, induced under color of official right and by wrongful fear of economic harm.

In violation of Title 18, United States Code, Section 1951.

### MANNER AND MEANS OF THE CONSPIRACY

3. The manner and means by which the defendant and his co-conspirators carried out, and attempted to carry out, the conspiracy included, but were not limited to, the following:

   a. Defendant RIDDLE and Monica Conyers exploited her position as a Trustee of the General Retirement System by conditioning her support for, and

- 5 -

assistance to, an owner of a technology company who sought a multi-million dollar investment from the General Retirement System, by RIDDLE demanding money from the owner, who agreed to pay RIDDLE, purportedly as a consultant.

b.    Defendant RIDDLE and Monica Conyers pressured a Detroit restaurant owner into paying RIDDLE a large sum of money ostensibly for consulting work, which was not performed nor contemplated.  The restaurant owner complied with the demands because of Conyers' position on the City Council.  Furthermore, RIDDLE and Conyers used, as a pressuring technique, the possible suppression, or non-disclosure, of a letter submitted to a regulatory agency whose actions could have caused economic harm to the interests of the restaurant owner, who had invested a substantial amount of money in a project over which the regulatory agency had jurisdiction.

c.   Defendant RIDDLE and Monica Conyers received a large sum of money from a person who represented a company that sought the transfer of a license for an adult entertainment club in return for a change of position regarding that transfer by Conyers in her capacity as a member of the Detroit City Council.

d.   Defendant RIDDLE and Monica Conyers attempted to receive money in the guise of a consulting agreement between RIDDLE and a real estate developer who sought financing from the General Retirement System and the support of Trustee Conyers in that endeavor.

- 6 -

e.  Monica Conyers, with the assistance of defendant RIDDLE, received cash payments from persons associated with Synagro Technologies, Inc., in connection with Conyers' vote in favor of an Amended and Restated Wastewater Plant Biosolids Supply Service Contract between the City of Detroit and Minergy Detroit, L.L.C.  (the "Synagro Contract"), approved by the Detroit City Council by resolution on November 20, 2007.

## OVERT ACTS

4.  In furtherance of the conspiracy and to effect its objects, the defendant and others committed a number of overt acts in the Eastern District of Michigan and else-where, including the following:

**Extortion of Technology Company**

5.  In about the spring of 2007, RIDDLE entered into an unwritten agreement with a technology company that hoped to obtain financing from the General Retirement System.  As part of this agreement, RIDDLE was to receive a total of $25,000 and three percent of the company if the company obtained the financing.

6.  On or about March 19, 2007, RIDDLE and Monica Conyers met with the owners of the technology company at Conyers' office to discuss the request for financing from the General Retirement System.

7.  At the March 21, 2007 meeting of the General Retirement System, the staff of the General Retirement System was directed to schedule representatives from the

technology company to appear before the Board of Trustees of the General Retirement System.

8.   On March 22, 2007, a $5,000 check drawn on the account of the technology company and dated March 22, 2007 was deposited into the account of Meridian Management Systems, RIDDLE's company.

9.   On March 29, 2007, a $5,000 check drawn on the account of the technology company and dated March 28, 2007 was deposited into the account of Meridian Management Systems.

10.   On March 30, 2007, $3,100 in cash was withdrawn from the Meridian Management Systems account.

11.   On April 11, 2007, the owners of the technology company made a presentation to the General Retirement System Board of Trustees.

12.   On April 23, 2007, a $5,000 check drawn on the account of the technology company and dated April 20, 2007, was deposited into the account of Meridian Management Systems.

13.   On April 24, 2007, $2,000 in cash was withdrawn from the Meridian Management Systems account.

14.   On June 15, 2007, in a telephone conversation with one of the owners of the technology company, RIDDLE informed the owner that Conyers had told RIDDLE that the General Retirement System had begun its due diligence investigation of the com-

pany's proposal, adding, "The only reason I'm calling you is 'cause, of course, what, what she wants is the last five. And I'm like, 'Will you just relax until we see that they're actually doing something.'"

15.   In a June 20, 2007 telephone conversation with one of the owners of the technology company, RIDDLE told the owner that Conyers had been at a meeting of the General Retirement System Board of Trustees. RIDDLE reminded the owner that, "there is one more payment of five due at your convenience." RIDDLE also said, "We got you on a track that very few people even know exists.  .  . Work on the, uh, five thing. So I can keep her chilled out and stuff."

16.   A July 10, 2007 telephone conversation between RIDDLE and the owner of the technology company included the following dialogue:

RIDDLE:   We really gotta make sure your strongest advocate is, is fairly geeked.  I mean, I tried to tell you that last week, I mean, now me and her are kinda in a tizzy.

Owner:   [Inaudible] I was just broke, I ain't trying –

RIDDLE:   .  .  . But what I'm trying to tell you -- is that see before when we did this we said that June would be the time for the last payment before anything else happened.

\*          \*          \*

RIDDLE:   What I'm concerned about is that your initial sponsor stay on your side. This bitch is a trip.

Owner:   I understand, I understand that - big guy.

RIDDLE:   You know, 'cause she is just like -

Owner:    Bottom line is - if I have to do something crazy to get the five, I'll go ahead and do the five to get the woman off my case.

17.    On July 16, 2007, a $5,000 check drawn on the account of a consulting company of one of the owners of the technology company and dated July 16, 2007, was deposited into the account of Meridian Management Systems.

18.    On July 17, 2007, RIDDLE called Conyers and told her about the check from one of the owners of the technology company:

RIDDLE:    Bank says the thing will post overnight and be available first thing in the morning. You know. It was just deposited yesterday afternoon.

Conyers:    That's fine.

19.    On July 18, 2007, $2,000 in cash was withdrawn from the Meridian Management Systems account.

20.    At the July 18, 2007 meeting of the Board of Trustees for the General Retirement System, the owners of the technology company appeared before the Board to provide an update on their firm's investment proposal.

21.    In an August 28, 2007 telephone conversation with the owner of the technology company, RIDDLE reassured the owner about his attempt to get financing with the General Retirement System, and possible additional financing from the Police and Fire Retirement System, by making the following statements:

RIDDLE:    If we can get this seven, we may even get some more through police and fire.

\*          \*          \*

- 10 -

RIDDLE:          What we can do, with the councilwoman coming in there fighting, we can kick it up a little bit.

\*          \*          \*

RIDDLE:          Whatever she is, you all wouldn't even be in the ball game if she hadn't presented it and pushed it.

22.  At the September 5, 2007 meeting of the General Retirement System, Conyers made a motion that the Board of Trustees conditionally approve a $5,000,000 investment in the technology company; however, the other trustee who supported the motion rescinded his support and the motion failed.

23.  In a September 5, 2007 conversation with RIDDLE, Conyers, expressing her outrage at the trustee who withdrew his support, explained to RIDDLE why she believed her motion had been defeated by the other Trustees of the General Retirement System and the possibility that the investment proposal would be referred to an investment firm which had a relationship with the General Retirement System.

24.  On November 14, 2007, RIDDLE and the one of the owners of the technology company had a telephone conversation about the possibility that the investment proposal by the technology company would be discussed at the General Retirement System Board of Trustees meeting that day and the fact that the owner need not contribute to Conyers' upcoming fund raiser because he had already given her enough money.  That conversation included the following dialogue:

RIDDLE:  All Monica told me was that it's coming up before the pension board, I don't know if it came up today.

Owner:     Oh, okay, so you –

RIDDLE:    I mean, I hope it didn't come up today because she wasn't there, you know.
           She got a messed up knee.  And, it definitely can't come up today, I hope.

Owner:     No, Lord, I hope not.

RIDDLE:    .   .    . We got this big fundraiser for her tomorrow, which she's asked me
           about getting you an invitation.  I hadn't and I mean – [expletive] it.  We've
           already, you've already done a lot...

25.  In a December 12, 2007 conversation with the owner of the technology

company, RIDDLE explained that a group of people on the General Retirement System

Board of Trustees was causing problems with his investment proposal and that Conyers

was upset because that group did not reciprocate: "She's pissed because she says she goes

with their people when they have something."

**Extortion of Detroit Restaurant Owner**

26.  In about April 2006, Monica Conyers requested that a Detroit restaurant

owner hire her chief of staff, RIDDLE, as a consultant, although the restaurant owner told

Conyers he did not need a consultant.

27.  In about April 2006, the restaurant owner signed a $10,000 consulting

agreement with RIDDLE for the period April to December 2006.

28.  On or about April 25, 2006, a $10,000 check from the restaurant owner's

company was deposited into the bank account of Meridian Management Systems,

RIDDLE's consulting business.

29.  In approximately May 2007, Conyers agreed to help the restaurant owner in

- 12 -

dealing with a federal regulatory agency.

    30.  A July 3, 2007 telephone conversation between Conyers and RIDDLE

included the following dialogue:

Conyers:   You need to go see [the restaurant owner] on Thursday.

     *       *       *

RIDDLE:  On Thursday, program me, you know, and him. Make sure he's the one
            programmed. Cause he's got the damn agreement already.

Conyers:   He knows. I already told him. I said, "You'll be seeing him on Thursday."

RIDDLE:  Yeah, uh, okay. Okay, uh...and...and that's about it. I have to dig out the
            agreement, but it was pretty clear on what it said.

Conyers:   Yeah, well get it out. And I'm going to give you this letter so you can be
            able to take it to him on Thursday.

RIDDLE:  Do what on Thursday?

Conyers:   This letter.

RIDDLE:  Oh, I know what you're saying. Okay. I know what it is.

    31.  On July 5, 2007, at approximately 12:10 p.m., Conyers called RIDDLE, and

they discussed the letter:

Conyers:   I wanted you to get, I wanted you to get that letter, I didn't want anybody
            else to have it.

RIDDLE:  Where is the letter?

Conyers:   It's being faxed to the office right now.

RIDDLE:  Oh. Okay, I know what to do with that.

32.  In a July 5, 2007 telephone conversation between RIDDLE and the restaurant owner at approximately 1:27 p.m., the following dialogue took place:

RIDDLE:  But, uh, anyway, no, I was calling regarding a letter I have for you, and I guess we're going to finish up the, uh, contract we had before, where we had, uh, something that was due in the fall, or in the spring, anyway, uh, when you get a chance, tell me when I should stop by.

Owner:  Um, how about sometime next week Tuesday or Wednesday.

33.  On July 5, 2007, at approximately 1:28 p.m., immediately after talking with the restaurant owner, RIDDLE called Conyers, and the following exchange took place:

Conyers:  Yeah Sam.

RIDDLE:  Uh, he told me to come next Tuesday or Wednesday.

Conyers:  Next Tuesday or Wednesday?

RIDDLE:  Yeah, no problem.  You don't give him the letter or anything then.

Conyers:  I won't.

RIDDLE:  Ok, I got it in my pocket, no sweat.

34.  On July 12, 2007, RIDDLE told Conyers that he had not heard from the restaurant owner.

35.  On July 13, 2007, Conyers instructed RIDDLE to call the restaurant owner and "bring the letter over there when you go."

36.  In a July 18, 2007 telephone conversation between RIDDLE and Conyers, they had the following exchange.

Conyers:  On Wednesday, go pick up a check from [the restaurant owner], okay?

- 14 -

RIDDLE:  You talk to him?

Conyers:  I'm with him right now and I gave, I showed him that it had been done. And he didn't think that I still wanted you to meet him to do that...

37.   On July 19, 2007, Conyers told RIDDLE to see the restaurant owner the following Wednesday (July 25) at 3:00 p.m.

38.   On July 25, 2007, RIDDLE left a voice mail message with the restaurant owner in which RIDDLE stated. "It's my understanding that we are to meet sometime today."

39.   On July 25, 2007, Conyers instructed RIDDLE to go to the office of the restaurant owner at 3:00 p.m. that day.

40.   On July 25, 2007, the restaurant owner paid RIDDLE another $10,000.

41.   On July 25, 2007, at approximately 3:30 p.m., RIDDLE deposited a $10,000 check from the restaurant owner's company into the bank account of Meridian Management Systems.

42.   On July 25, 2007, at approximately 4:30 p.m., RIDDLE and Conyers had a telephone conversation, which included the following dialogue:

RIDDLE:  Everything's taken care of.

\*          \*          \*

Conyers:  We got a different agreement this time.

RIDDLE:  A different what?

Conyers:   Agreement this time.

RIDDLE:  With who?

Conyers:   Me and you.

    43.  On July 26, 2007, RIDDLE and Conyers discussed the restaurant owner's

check and engaged in the following exchange:

RIDDLE:  It's held for a day and then it should clear – without any problems.

      *       *       *

Conyers:   Was it the same as last time?

RIDDLE:  Something like that, . . . yeah  but it's still more owed.  I'll go over that with
            you. And I'll let you know what we need to tell him . . . All he's doing now
            is catching up with last fall.  Anyway, but I'll talk about that in person when
            we get together.

Conyers:   OK.  And so that's what I'm saying about that is what you got is 6-4.

RIDDLE:  OK I'll talk to you about all this deal.

    44.  On July 27, 2007, $3,000 in cash was withdrawn from the Meridian Manage-

ment Systems account.

    45.  On July 31, 2007, RIDDLE withdrew $1,500 in cash from the Meridian

Management Systems bank account.

    46.  On July 31, 2007, Conyers and RIDDLE had a telephone conversation in

which they discussed $1,500 in cash that RIDDLE had given to Conyers.

    47. On November 26, 2007, Conyers called RIDDLE and asked him if he had

seen the restaurant owner that day or recently regarding the contract.  RIDDLE said he

had not seen the restaurant owner, adding, "If he had, my account would certainly have

reflected it." RIDDLE then said, "Remember the last time I saw him, Miss 60/40."

48.   On November 27, 2007, Conyers called RIDDLE to find out when she would receive additional cash that she believed had been paid to RIDDLE by the restaurant owner.  That call included the following exchange:

Conyers:   You'd better get my loot, that's all I know.

RIDDLE:   From who?

Conyers:   The loot you already got for the, already got, and you supposed to pay me.

49.   During the course of the conspiracy, RIDDLE passed $10,000 to Conyers of the $20,000 that RIDDLE had received from the restaurant owner.

**Extortion and Attempted Extortion Relating to Adult Entertainment Club**

50.   In approximately October 2006, Conyers told a consultant for an adult entertainment club company ("club company") to meet with RIDDLE to discuss the company's desire to get City Council to approve the transfer of a liquor and topless dancing license for a club in Detroit.

51.   On or about October 27, 2006, RIDDLE met with the club company consultant in Conyers' office and said that he could help the consultant, but they would need to discuss it outside the office.

52.   In approximately late October 2006, during a meeting at a restaurant in Detroit, RIDDLE suggested to the club company consultant that if the club company wanted to get approval for the license transfer, the club company should hire RIDDLE's

consulting company for $25,000.

53. In approximately late October or early November 2006, representatives of the club company met with RIDDLE at a restaurant in Dearborn, at which time RIDDLE suggested that they needed to pay RIDDLE $25,000 if they wanted Conyers' vote. The representatives refused to pay RIDDLE.

54. On or about November 13, 2006, Conyers voted against the transfer of the licenses.

55. On or about November 15, 2006, RIDDLE contacted the club company's consultant and said that the consultant needed to hire RIDDLE's consulting company and then Conyers would reconsider her vote.

56. On or about November 17, 2006, the club company's consultant gave RIDDLE a $10,000 check (earmarked for the motion for reconsideration) and a $15,000 check (as a success fee).

57. On or about November 17, 2006, Conyers made a formal request to reconsider her vote.

58. On or about November 17, 2006, RIDDLE cashed the $10,000 check from the club company's consultant.

59. On or about November 18, 2006, Conyers said that she wanted to reconsider her vote, but delayed the reconsideration until after the Council's winter recess.

60. In or about November 2006, RIDDLE unsuccessfully attempted to cash the

$15,000 "success fee" check, which previously had been voided by the club company's

consultant.

61. On or about January 3, 2007, Conyers canceled her request for reconsidera-

tion of her previous "no" vote.

## Attempted Extortion of Real Estate Developer

62. In the early summer of 2007, Conyers suggested that a real estate developer

hire RIDDLE as a consultant to facilitate the developer's efforts to obtain financing from

the General Retirement System for one of his projects.

63. At a meeting in the early summer of 2007 in which the developer met with

Conyers and RIDDLE to discuss possible financing of his project by the General Retire-

ment System, RIDDLE told the developer he would send him a consulting agreement.

64. In anticipation of an appearance by the real estate developer who was

scheduled to appear before the General Retirement System Board of Trustees on June 20,

2007 to make a presentation in an attempt to obtain financing with the help of Conyers,

RIDDLE and Conyers talked about the upcoming presentation in a telephone call on June

19, 2007:

Conyers:    [The Real Estate Developer is] coming tomorrow . . . I gotta be there for my
            people.  If I don't be there for nobody else, I gotta be there for my people.
            Or they'll just flip them off.

Riddle:     That's the truth.

65. On August 8, 2007, Conyers and RIDDLE discussed the prospective consult-

ing agreement with the developer.  RIDDLE agreed to draw up a contract with a provision that, among other things, they would get two percent of the investment.

66.    On August 9, 2007,  RIDDLE and Conyers discussed the consulting agreement:

RIDDLE:  I got the contract done, too, for [the real estate developer] and [his company].  So, whenever you're ready.

Conyers:   I'll get that from you today.

67.   In approximately August 2007, Conyers and RIDDLE attempted to have the developer sign a consulting agreement with RIDDLE.

**Payments Relating to the Synagro Contract**

68.   In or about the summer of 2007, at the direction of Rayford Jackson, who was a representative of Synagro, the company which was attempting to get a contract with the City of Detroit, a courier handed a package to RIDDLE in front of the City-County Building for delivery to Monica Conyers.

69.   On October 17, 2007, Conyers and Rayford Jackson arranged to meet outside the departure area of the Northwest Airlines terminal, before Conyers left on a flight.

70.   On October 17, 2007, at 11:24 a.m., Rayford Jackson called Conyers to tell her he was at the airport, and the following exchange took place:

Jackson:    Hello, I'm here.  You want me to come in or see Sam?

Conyers:   Just see Sam 'cause I'm checking in and I'll come right outside.

71.   On October 17, 2007, at 11:25 a.m., Rayford Jackson approached RIDDLE,

who was standing next to a car outside of the Northwest terminal of the airport, and handed RIDDLE cash, which RIDDLE immediately put into his pocket.

72.   On October 17, 2007, at about 11:30 a.m., Conyers approached RIDDLE and Rayford Jackson as they stood next to the car, after which RIDDLE reached into his pocket and handed the cash to Conyers.

73.   On October 17, 2007, at 11:46 a.m., Jackson called a Synagro representative, and said he had just left a meeting with "Monica and Sam," and that "She's doing fine. She's happy.  We got a game plan. . . . She's not gonna flip. . . . She says we got her vote."

74.   On October 17, 2007, at 11:59 a.m., RIDDLE called Rayford and asked, "I guess everything that, uh, you had said you were doing occurred today, right?  With her?" RIDDLE added, "I didn't even know what it was.  I don't even know what it is." RIDDLE then asked, "But, everything was okay with what you intent on doing today, right? . . . with the Councilwoman? . . . I'll talk to you in person about it."

75.   On December 4, 2007, at about 2:30 p.m., a courier met Conyers and RIDDLE in a McDonald's parking lot in Detroit, at which time Conyers received an envelope containing $3,000 in cash.

In violation of Title 18, United States Code, Section 1951.

## COUNT TWO
### (18 U.S.C. § 1951  – Interference with Commerce by Extortion)

**D-4    SAMUEL L. RIDDLE, JR.**

In or about the spring and summer of 2007, in the Eastern District of Michigan,

defendant SAMUEL L. RIDDLE, JR. did knowingly and unlawfully use Monica Con-

yers' position and office as City Council's *ex officio* representative on the Board of

Trustees of the City of Detroit General Retirement System to obtain property, that is,

payments totaling about $20,000 from a technology company, with the consent of the

owner of the company, induced by wrongful fear of economic harm and under color of

official right, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT THREE
### (18 U.S.C. §§ 1341, 1346  – Honest Services Mail Fraud)

**D-4    SAMUEL L. RIDDLE, JR.**

1.  Paragraphs One through Five of the General Allegations are incorporated by

reference as if set forth in full herein.

### Scheme To Defraud

2.  From approximately March 2007 to December 2007, in the Eastern District of

Michigan, defendant SAMUEL L. RIDDLE, JR. and Monica Conyers knowingly and

willfully devised and intended to devise a scheme to defraud and deprive the participants

and beneficiaries of the General Retirement System of the City of Detroit their right to the

honest services of Trustee Monica Conyers.

3.  It was an object of the scheme to defraud that RIDDLE and Monica Conyers

would use Conyers' position as the Detroit City Council's *ex officio* representative on the

Board of Trustees of the City of Detroit General Retirement System to obtain approxi-

mately $20,000 for RIDDLE and Conyers from a technology company which attempted

to acquire financing from the General Retirement System, without disclosing conflicts of

interest by RIDDLE and Conyers to the participants and beneficiaries of the General

Retirement System.

### Mailing

4.  For the purpose of executing the above-described scheme and artifice and

attempting to do so, RIDDLE and Conyers caused a letter from the General Retirement

System to be placed in authorized depositories of the United States Postal Service to be

delivered to the owner of the technology company according to the directions thereon on

or about April 4, 2007, in the Eastern District of Michigan.

In violation of Title 18, United States Code, Sections 1341, 1346, and 2.

### COUNT FOUR
**(18 U.S.C. § 1951  – Attempted Interference with Commerce by Extortion)**

**D-4    SAMUEL L. RIDDLE, JR.**

In or about the spring and summer of 2007, in the Eastern District of Michigan,

defendant SAMUEL L. RIDDLE, JR. and Monica Conyers did knowingly attempt to

obstruct, delay, and affect interstate commerce by extortion, that is, RIDDLE and Conyers

attempted to unlawfully obtain a large sum of money from a Detroit restaurant owner with

the consent of the restaurant owner, which consent the defendant believed was induced by

wrongful fear of economic harm and under color of official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT FIVE
### (18 U.S.C. § 1951  – Interference with Commerce by Extortion)

**D-4    SAMUEL L. RIDDLE, JR.**

In or about the fall of 2006, in the Eastern District of Michigan, defendant

SAMUEL L. RIDDLE, JR. did knowingly and unlawfully use Monica Conyers' position

and office as a member of the Detroit City Council to obtain a large sum of money from

the consultant for a company operating adult entertainment clubs, with the consent of the

consultant, induced by wrongful fear of economic harm and under color of official right,

which conduct affected interstate commerce.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT SIX
### (18 U.S.C. § 666(a)  – Bribery Concerning Programs Receiving Federal Funds)

**D-4    SAMUEL L. RIDDLE, JR.**

On or about October 17, 2007, in the Eastern District of Michigan, defendant

SAMUEL L. RIDDLE, JR. aided and abetted Monica Conyers, who at the time was an

agent of the City of Detroit, an entity that received more than $10,000 in federal funding

during the calendar year 2007, in corruptly accepting cash for Monica Conyers, who

- 24 -

RIDDLE knew was intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit.

All in violation of Title 18, United States Code, Sections 666(a) and 2.

## COUNT SEVEN
### (18 U.S.C. § 1001 - False Statements)

**D-4    SAMUEL L. RIDDLE, JR.**

On or about June 6, 2008, in the Eastern District of Michigan, Southern Division, defendant SAMUEL L. RIDDLE, JR. did knowingly and willfully make a false, fictitious and fraudulent material statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency within the Executive Branch of the United States. Specifically, in response to questions by FBI Special Agents at the Federal Building in Detroit, RIDDLE claimed that Rayford Jackson handed RIDDLE cash at the Detroit Metropolitan Airport on October 17, 2007, as repayment for consulting work RIDDLE had performed for the Nation of Islam. In truth and in fact, and as RIDDLE well knew at that time, Rayford Jackson handed the cash to RIDDLE not to repay RIDDLE, but to give the cash to Monica Conyers, which RIDDLE promptly did as Conyers emerged from the airport terminal.

In violation of Title 18, United States Code, Section 1001.

## CRIMINAL FORFEITURE ALLEGATIONS
## (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)

1.  Upon conviction of one or more counts of extortion, or interference with commerce by extortion, or attempted interference with commerce by extortion, and/or conspiracy to commit extortion, in violation of Title 18, United States Code, Section 1951, as alleged in Counts One, Two, Four, and/or Five of this Indictment, Defendant SAMUEL L. RIDDLE, JR. shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, his right, title and interest in any property, real or personal, which constitutes or is derived from proceeds traceable to extortion, or interference with commerce by extortion, or attempted interference with commerce by extortion, and/or conspiracy to commit extortion, in violation of 18 U.S.C. § 1951.

2.  Property subject to forfeiture to the United States includes, but is not limited to, the following:

    a.  Twenty thousand dollars ($20,000.00) in United States Currency funds, as monies related to a technology company, as alleged in Counts One and/or Two of this Indictment;

    b.  Twenty thousand dollars ($20,000.00) in United States Currency funds, as monies related to a Detroit restaurant owner, as alleged in Counts One and/or Four of this Indictment; and

    c.  Ten thousand dollars ($10,000.00) in United States Currency funds, as monies related to an adult entertainment club, as alleged in Counts One and/or Five of this Indictment.

3.  Substitute Assets:  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), Defendant RIDDLE shall

forfeit substitute property, up to the value of the properties described in paragraph Two above, if, by any act or omission of the defendant, the property described in paragraph Two:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred, sold to or deposited with a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2, Federal Rules of Criminal Procedure.

THIS IS A TRUE BILL.

s/Foreperson
FOREPERSON

TERRENCE BERG
United States Attorney

s/Robert Cares
ROBERT CARES
Assistant United States Attorney

s/David A. Gardey
DAVID A. GARDEY
Assistant United States Attorney

Date:  July 15, 2009

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case Number<br>09-20025 |
| --- | --- | --- |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| Companion Case Information | Companion Case Number: |
| --- | --- |
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | Judge Assigned: |
| ☐ **Yes**   ■ **No** | AUSA's Initials: RPC |

**Case Title:** USA v.  D-4  Samuel L. Riddle, Jr.

**County where offense occurred :** Wayne

**Check One:**   ■ **Felony**        ☐ **Misdemeanor**        ☐ **Petty**

_____  Indictment/____Information --- **no prior complaint.**

_____  Indictment/_____ Information --- based upon prior complaint [Case number: ]

__✓__  **Indictment — based upon** LCrR 57.10 (d) *[Complete Superseding section below].*

**Superseding Case Information:**

**Superseding to Case No:**  09-20025            **Judge:**   Avern Cohn

☐    Original case was terminated; no additional charges or defendants.
☐    Corrects errors; no additional charges or defendants.
☐    Involves, for plea purposes, different charges or adds counts.
■    Embraces same subject matter but adds the additional defendants or charges below:

| Defendant name | Charges | Prior Complaint (if applicable) |
| --- | --- | --- |
| Samuel L. Riddle, Jr. | 18 U.S.C. § 1951<br>18 U.S.C. §§ 1341, 1346<br>18 U.S.C. § 666<br>18 U.S.C. § 1001<br>18 U.S.C. § 2 | N/A |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

July 15, 2009
Date

ROBERT CARES (P28888)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9736
E-Mail: Robert.Cares@usdoj.gov

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/20/04