UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                  Case No. 09-20025

D-4, SAMUEL L. RIDDLE, JR.,                                    HONORABLE AVERN COHN

    Defendant.

_____/

**MEMORANDUM AND ORDER**
**DENYING DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE TO STAY PROCEEDINGS, AND FOR AN EVIDENTIARY HEARING (Dkt. # 109)**

I.

This is a criminal case. Voir dire began on January 5, 2010 when 100 prospective jurors were called to the courthouse and filled out a detailed questionnaire. Individual voir dire began on January 11, 2010. Before the Court is defendant's motion to dismiss, or in the alternative to stay proceedings, and for an evidentiary hearing. Defendant argues that, because there were only nine African-Americans in a pool of 100 prospective jurors, there is an under representation of African-Americans which violates his Sixth Amendment right to be tried by a jury which represents a fair cross section of the community. He further argues that this under representation violates the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq. (JSSA), which requires that the nine counties from which the jurors are drawn be "substantially proportionally represented in the jury master wheel." 28 U.S.C. § 1863(B)(3).

For the reasons that follow, the motion will be denied. As will be explained,

defendant's contention that the composition of the 100 prospective jurors shows a systematic exclusion of African-Americans is misplaced. To the extent he is challenging this district's juror selection plan, the issue has been decided by another judge who held the process passes constitutional muster. See United States v. Bates, No. 05-81027, 2009 WL 5033928 (E.D. Mich. Dec. 15, 2009).[1]

II.

A.

The Eastern District of Michigan covers 34 counties in Michigan's lower peninsula. For jury-selection purposes, the district is split into five divisions; each division draws jurors from a certain number of counties. The Court sits in the Detroit Division, which selects its jurors from nine counties: Jackson, Lenawee, Macomb, Monroe, Oakland, St. Clair, Sanilac, Washtenaw and Wayne. The juror selection plan in this district and approved by the Judicial Council for the Sixth Circuit was established by administrative order. See E.D. Mich. Admin. Order No. 00-AO-083 § (d) (Dec. 26, 2000) [hereinafter Juror Selection Plan]. Under the Juror Selection Plan, the Clerk of the Court must generate a Master Jury Wheel for each of the district's five divisions, ensuring that "each county within a division is proportionally represented." Juror Selection Plan § (h)(2). Voter registration lists are used to calculate the proportional representation of individual counties. The proportional representation determination dictates how many names to draw from each county to compose the division's Master Jury Wheel. The names are obtained by random selection from voter registration lists,

---

[1] Bates filed a Notice of Appeal on December 29, 2009.

the state drivers' license list, and state personal identification card list.  Juror Selection Plan § (f).

> In <u>Bates</u>, the district court explained the process in detail:
>
> The jury-selection process begins when the Eastern District's Jury Department obtains three lists from the Michigan Secretary of State: registered voters, licensed drivers, and holders of state-issued identification documents. . . . The Jury Department provides the list of registered voters to Sutera Data Systems ("SDS"), a data-processing firm contracted to compile the Master Wheel. . . SDS determines the number of registered voters in each of the nine counties comprising the Detroit Division, and calculates each county's proportionate share of the Division's total voting population. Based on these figures, the Court issues an Administrative Order to create a new Master Wheel for the Division, in which it specifies the number of people to be drawn from each county for possible jury service. . . .The Jury Department next provides the list of licensed drivers and holders of state-issued ID cards to SDS, with instructions to create the Master Wheel; it is to be filled with actual names of potential jurors.  SDS begins by making separate lists of 5 licensed drivers and state ID holders for each county in the Division.  Next, for each county, SDS merges the three lists (registered voters, licensed drivers, people with state-issued IDs) and eliminates duplicate names. . . . Finally, SDS selects names at random from the merged list for each county, based on the proportions set forth in the Administrative Order, to create the Master Wheel. . . . In the next step, the Jury Department randomly draws 5,000 names from the Master Wheel and sends juror questionnaires to these people. . . . The Jury Department then processes the completed questionnaires and decides who is not qualified or who should be excused. Noncitizens, convicted felons, and people who cannot read and write English, among others, are disqualified from jury service under federal law. . . . Active members of the armed forces, police and fire department members, and certain public officials are also exempt. . .. The Eastern District also exempts people over 70, firefighters and ambulance crews, and persons who served on a jury within the last two years. . . Once unqualified and exempt respondents are eliminated, what remains are the completed questionnaires of people who will make up the Detroit Division's Qualified Jury Wheel ("the Qualified Wheel").  In the final step, the Jury Department randomly draws a "jury pool" of about 400 people from the Qualified Wheel.  As they are selected, each person is assigned a number from one to 400; when they are called to service, jurors are called in sequence, starting with the number one. A given jury pool remains on call for two weeks, and its members must be ready to report on a day's notice.

<u>Bates</u>, 2009 WL 5033928 at * 2-3 (internal citations omitted).

B.

As described above, there are several levels of jury selection.  First, there is the selection of the Master Wheel.  The second level is the random selection of prospective jurors from the Master Wheel.  The third level is the creation of the Qualified Wheel from those jurors.  Obviously, this number varies depending on the number of individuals who are not qualified or are exempted from service.  The fourth level is the "jury pool" of names (approximately 400) which are randomly selected from the Qualified Wheel.

Here, the group of 100 prospective jurors who came to the courthouse and filled out questionnaires was part of the "jury pool," not the Master Wheel or the Qualified Wheel.  Defendant relies on the composition of the 100 prospective jurors to argue that African-Americans are systematically excluded from jury service in violation of the Sixth Amendment and the JSSA.  Defendant therefore asks that the indictment be dismissed, or stayed pending an evidentiary hearing on the issue of jury selection in this district.

III.

The Sixth Amendment requires that jury panels be drawn from a source representing a "fair cross section" of the community in which the defendant is tried. Taylor v. Louisiana, 419 U.S. 522, 536 (1975).  In Duren v. Missouri, the Supreme Court set forth the three elements that must be shown to establish a prima facie violation of the "fair cross-section" requirement: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.  439 U.S. 357, 364

(1979).

Likewise, the JSSA is designed to secure in federal courts a trial by a jury "selected at random from a fair cross section of the community," 28 U.S.C. § 1861, from which no citizen is excluded on the basis of invidious discrimination, id. § 1862.  To that end, the Act provides that federal district courts must devise a plan for random selection of grand and petit jurors, id. § 1863, and sets forth procedures for drawing names from a master wheel and summoning, qualifying, and impaneling jurors for service, id. §§ 1864-66.  The Act also permits a defendant to move to dismiss the indictment or stay proceedings "on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury." id. § 1867(a).  However, such a motion must be made "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, **whichever is earlier** . . . ." id. at § 1867(a) (emphasis added).  This timeliness requirement "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act." United States v. Ovalle, 136 F.3d 1092, 1098 (6th Cir.1998) (quoting United States v. Bearden, 659 F.2d 590, 595 (5th Cir.1981), cert. denied, 456 U.S. 936 (1982)); see also United States v. Young, 570 F.2d 152, 153 (6th Cir.1978); United States v. Bates, No. 05-81027, 2009 WL 3270190 (E.D. Mich. Oct. 9, 2009).

The JSSA also requires that the motion contain "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title."  28 U.S.C. § 1867(d).

5

IV.

A.

As an initial matter, there are procedural problems with defendant's motion. Defendant's statutory claim could be considered untimely, as the government urges. Defendant did not file a JSSA challenge prior to the voir dire examination which began on Tuesday, January 5. Defendant says that the basis for the motion--the pool of 100 prospective jurors–was not known until later. However, defendant argues that the under representation of African-Americans has been a "chronic problem for years." (Defendant's Motion at p. 1). This statement implies that defendant was aware of the alleged infirmities in jury venires in this district before jury selection began and could have filed the motion well in advance of the trial, and certainly before voir dire began. Additionally, as the government points out, defendant did not include a sworn statement with the motion as required by the JSSA.[2]  See 28 U.S.C. § 1867(d).

B.

Putting these issues aside, defendant's contention that the jury selection is infirm based on the racial composition of the 100 prospective jurors is misguided. While defendant is not attacking the petit jury, which has yet to be selected, his attack improperly focuses on the smaller panel of 100 prospective jurors, not the larger Master Wheel from which all names are drawn. In Taylor, the Supreme Court stated:

---

[2]Also, it is worth noting that there is administrative order pertaining to challenges to the jury selection process, including the disclosure of juror information, which contemplates reference of the matter to the Chief Judge. See E.D. Mich. Admin. Order No. 00-AO-060 (June 5, 2000).

> It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. **Defendants are not entitled to a jury of any particular composition**, Fay v. New York, 332 U.S. 261, 284, 67 S.Ct. 1613, 1625, 91 L.Ed. 2043 (1947); Apodaca v. Oregon, 406 U.S., at 413, 92 S.Ct., at 1634 (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

419 U.S. at 538 (emphasis added).  Thus, the Supreme Court has explained that the Sixth Amendment's "fair cross-section" requirement applies only to the larger pool serving as the source of prospective jurors' names and not to the petit jury sworn for a defendant's trial.  The Sixth Amendment therefore "guarantees the opportunity for a representative jury venire, not a representative venire itself." United States v. Jackman, 46 F.3d 1240, 1244 (2d Cir. 1995) (citing Roman v. Abrams, 822 F.2d 214, 229 (2d Cir. 1987), cert. denied, 489 U.S. 1052 (1989)).

     Defendant cannot rely solely on the composition of the 100 prospective jurors to demonstrate systematic exclusion.  Courts have rejected similar challenges.  In Jordan v. Walker, No. 01-CV-0507, 2007 WL 2344861 (W.D.N.Y. Aug. 14, 2007), there was only one African-American juror in the second pool of prospective jurors called for jury duty.  The district court found that the "the fact that there was only one black juror in a pool of 104 potential jurors does not, in and of itself, establish the Duren requirements of unfair underrepresentation and systematic exclusion." Id. at *7.  Moreover, in United States v. Joyner, 201 F.3d 61, 75 (2d Cir. 2000), the defendant argued that his Sixth Amendment right to a jury of his peers was violated as the venire contained only one African-American out of 500 prospective jurors.  The Second Circuit disagreed and stated that defendant "failed to establish a prima facie case because he made

7

absolutely no showing that African Americans were systematically excluded or that the district court's use of voter registration and motor vehicle bureau lists to select the venire result[ed] in unfair underrepresentation." Id. (citing Duren v. Missouri, 439 U.S. at 364).  Finally, in United States v. Booker, No. 05-1929, 2007 WL 2492427 (6th Cir. Sept. 5, 2007), the defendant argued that jury venire did not represent a fair cross section of the community, particularly as to African Americans and Hispanics, in violation of the Equal Protection Clause, the Sixth Amendment and the JSSA.  The Sixth Circuit rejected this argument, noting that defendant did not show "that the representation of either group was not 'fair and reasonable,' Duren, 439 U.S. at 364, which is to say, that either of these groups was 'substantially underrepresented' in the **jury wheel**," Booker at *2.  (citing Castaneda v. Partida, 430 U.S. 482, 495 n. 14 (1977)) (emphasis added).  Thus, defendant has improperly focused on the composition of the 100 prospective jurors, rather than the process for creating the Master Wheel, in making his claims.

C.

Finally, the constitutionality of the Juror Selection Plan was fully considered in Bates.  The district court found the process constitutional, although imperfect.[3]  Although defendant argues that Bates is not persuasive because the jury in that case was selected pursuant to a different administrative order, this argument is not well-taken.  The Master Wheel in the Bates trial was selected pursuant to E.D. Mich. Admin.

---

[3]The Court has some familiarity with the imperfections in the process.  See David R. Sherwood and Avern Cohn, The Rise and Fall of Affirmative Action in Jury Selection, 32 U. MICH. J.L. REF. 325 (1999).

8

Order No. 04-AO-0116 (Feb. 4, 2004).  The Master Wheel in this case was selected pursuant to E.D. Mich. Admin. Order No. 08-AO-033 (Aug. 5, 2008).  The only differences in the administrative orders relate to the numbers used to create the Master Wheel and the proportional representation by county.  The way in which names are drawn is still governed by the Juror Selection Plan.  In short, there is no functional difference in the jury selection process used in <u>Bates</u> and the process used in this case.

V.

For the reasons stated above, defendant's motion is DENIED.

SO ORDERED.

 s/ Avern Cohn  
AVERN COHN  
UNITED STATES DISTRICT JUDGE

Dated:  January 12, 2010

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, January 12, 2010, by electronic and/or ordinary mail.

 s/ Julie Owens  
Case Manager, (313) 234-5160